UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JOSEPH WOERNER, individually and on behalf of all others similarly situated, | |
| Plaintiff, | No. 16 C 5296 |
| v. | Judge Thomas M. Durkin |
| BANKERS LIFE AND CASUALTY COMPANY, | |
| Defendant. | |

**MEMORANDUM OPINION AND ORDER**

Joseph Woerner was an insurance agent for Bankers Life and Casualty Company. He alleges that his hiring by Bankers Life was part of a pyramid scheme in which Bankers Life hires more agents than it needs in order to exact the fees it charges new agents, and to claw back sales commissions under false pretenses when surplus agents inevitably leave the company. Woerner alleges that Bankers Life's conduct constitutes: a violation of his agency contract (Count I); a violation of the covenant of good faith and fair dealing under Illinois law (Count II); and a violation of the Illinois Consumer Fraud Act (Count III). R. 1-1. Bankers Life has moved to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). R. 16. For the following reasons, that motion is denied in part and granted in part.

**Legal Standard**

A Rule 12(b)(6) motion challenges the sufficiency of the complaint. *See, e.g., Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). A complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), sufficient to provide defendant with "fair notice" of the claim and the basis for it. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). This standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While "detailed factual allegations" are not required, "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. The complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). "'A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Mann v. Vogel*, 707 F.3d 872, 877 (7th Cir. 2013) (quoting *Iqbal*, 556 U.S. at 678). In applying this standard, the Court accepts all well-pleaded facts as true and draws all reasonable inferences in favor of the non-moving party. *Mann*, 707 F.3d at 877.

**Background**

Woerner is a resident of Virginia, and Bankers Life is a Delaware corporation headquartered in Chicago. R. 1-1 at 7 (¶¶ 9-10). In October 2014, Woerner signed a contract to be an insurance agent for Bankers Life. *Id.* at 9 (¶¶ 17). The contract

was a standard form signed by all Bankers Life agents (the "Agent Contract"). *Id.* at 4-5 (¶ 2), 37-48. The Agent Contract provides that the agent will be compensated by commissions on policies the agent sells. *Id.* at 9-10 (¶ 19), 39 (¶ 9). The Agent Contract also allows Bankers Life to "reject any application for insurance submitted by the agent without specifying the reason therefore," *id.* at 40 (¶ 12), and provides that "[w]henever a premium has been refunded to an applicant or policyholder, the agent agrees to immediately return to [Bankers Life] any commissions received on the amount refunded." *Id.* at 40 (¶ 13). Bankers Life also has permission to "deduct" any commissions an agent is obligated to return to Bankers Life from any future commissions (or other payments Bankers Life may owe to the agent). *Id.* at 41 (¶ 14). When Bankers Life requires an agent to return a commission it is known as a "chargeback." *Id.* at 5 (¶ 4). Agents generally continue to receive commissions on premiums for renewal of policies they sold even after they have left Bankers Life. *Id.*

Woerner alleges that Bankers Life's business model "requires a huge number of agents," and that many agents quit or are fired within less than a year of their state date. *Id.* at 8 (¶ 13). Bankers Life requires new agents to pay "hundreds of dollars in non-refundable fees," including "licensing fees [and] list fees." *Id.* at 8 (¶ 15). Bankers Life also requires new agents to pay "approximately $300" to create a "holdback" account out of which Bankers Life deducts chargebacks. *Id.*

Woerner alleges that "it is common company practice at Bankers Life for senior agents to 're-write' policies [sold] by former agents in order to justify

3

commission chargebacks and to reassign the policy [renewal] commission stream from the [former agent] to a current senior agent." *Id.* at 5 (¶ 4). According to Woerner, "the 're-writing' of the policies is pretextual, with Bankers Life typically making nothing more than an immaterial change, such as altering the policy name." *Id.* Bankers Life then seeks repayment of commissions from the former agent based on these "re-writes," while a current agent receives the commission for the "rewritten" policy.

In the form letter Bankers Life sends to former agents seeking repayment of commissions, Bankers Life does not provide a specific justification for the chargeback, but instead lists the *potential* reasons for the chargeback. According to the form letter, these potential reasons include the following: the relevant policy "lapsed, canceled or issued as out for signature and not completed [sic]," or the policy's "automatic bank draft was canceled," the policy's "Errors and Omissions Insurance premiums were unrecovered," or "other contractual charges were applied." *Id.* at 11 (¶ 24). Woerner alleges that none of these stated reasons "is a legitimate basis for requiring a [former agent] to refund a commission" under the terms of the Agent Contract. *Id.* at 11 (¶ 25). Indeed, according to Woerner, the "re-write" process does not "typically" involve refunding the premium to the policyholder, *id.* at 11-12 (¶ 25), and Woerner contends that a premium refund is the only basis for a chargeback under the terms of the Agent Contract.

Woerner alleges that his agency agreement with Bankers Life was terminated because he expressed that he did not want to participate in the "re-

4

write" process. *Id.* at 12-13 (¶¶ 28-30). After his termination, Woerner received a letter from Bankers Life requesting the return of $473.96 in commissions. *Id.* at 14 (¶ 33). The letter did not specify the relevant policies for which premiums had been returned. Woerner alleges that Bankers Life responded to his request for an accounting with "a largely indecipherable account log which does not validate the debts or otherwise explain the charges or how they are derived." *Id.* at 15 (¶ 38). Bankers Life sent two additional letters to Woerner explaining that the amount of commissions he was obligated to return had increased to $696.58. *Id.* at 14-15 (¶¶ 34, 37). Woerner then received a notice from a debt collator regarding this amount due. *Id.* at 15 (¶ 39). Woerner's complaint includes many statements posted to the internet by other former Bankers Life agents complaining of similar chargeback demands by Bankers Life. *Id.* at 16-28 (¶¶ 40-57).

## Analysis

### I. Breach of Contract

Woerner claims that Bankers Life breached his Agent Contract by seeking chargebacks on policies for which the premiums were not returned. Woerner also alleges that Bankers Life's policy of charging new agents certain fees violates the Agent Contract.

#### A. Chargebacks

Bankers Life concedes that "if Woerner alleged that certain chargebacks were improper, that would state a claim." R. 17 at 16. Bankers Life, however, argues that Woerner has failed to state such a claim because he admits that he does not *know*

5

whether the chargebacks Bankers Life seeks from him are legitimate. But it would be unrealistic and improper to require Woerner to allege with such specificity that Bankers Life's chargebacks lack justification when it is likely that only Bankers Life has access to the evidence that could confirm Woerner's claims. Woerner alleges that he sought such justification, but Bankers Life provided him with an account log that he was unable to decipher. In the context of fraud claims, the Seventh Circuit has held that plaintiffs are not required to fully comply with the heightened pleading standard of Federal Rule of Civil Procedure 9(b) when the evidence is necessarily in the possession of the defendant. *See Pirelli Armstrong Tire Corp., Retiree Medical Benefits Trust v. Walgreen Co.*, 631 F.3d 436, 443 (7th Cir. 2011). This reasoning should certainly also apply to Rule 8's lower standard of pleading. Since Bankers Life possesses the evidence necessary to determine whether Woerner's claims are meritorious, his failure to allege the existence of such facts does not require dismissal of his claims at this stage of the proceedings.

In any event, just because Woerner does not have *certain* knowledge that the particular chargebacks against him are unjustified does not mean that he has failed to allege a *plausible* claim for breach of contract. *See In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 629 (7th Cir. 2010) ("the complaint must establish a nonnegligible probability that the claim is valid; but the probability need not be as great as such terms as 'preponderance of the evidence' connote"); *see also In re London Silver Fixing, Ltd., Antitrust Litig.*, 2016 WL 5794777, at *6 (S.D.N.Y. Oct. 3, 2016) ("'Plausibility' is not certainty."); *Innospec Fuel Specialties, LLC v. Isochem*

6

*N. Am., LLC*, 2012 WL 715875, at *3 (D.N.J. Mar. 5, 2012) ("The plausibility standard of *Iqbal* does not require total certainty."). Despite Woerner's failure to specifically allege that Bankers Life lacks justification for the chargebacks it seeks from him, the facts Woerner has alleged are a sufficient basis for the Court to plausibly infer that Bankers Life has breached its Agent Contract with Woerner. Woerner alleges that when he was an agent for Bankers Life, he was instructed to "re-write" policies that had been sold by former agents for the specific purpose of forcing the former agent to pay commissions back to Bankers Life for the benefit of current agents. He also alleges that this was not a one-time occurrence but rather a "common company practice." This is enough reason for Woerner to believe that the chargebacks Bankers Life seeks from him are illegitimate. And Bankers Life does not argue that these allegations are improperly pled. Therefore, the Court will not dismiss Woerner's breach of contract claim at this stage of the proceedings.[1]

---

[1] Bankers Life attached to its motion a document called the "Agent Manual." Bankers Life contends that this document is incorporated into the Agent Contract, which provides, "The authority given in this contract is subject to the provisions and limitations contained herein, and in the Company's manual, rate books, rules and regulations." R. 1-1 at 39 (¶ 8). To the extent the Agent Manual is incorporated into the Agent Contract, the Manual might be read to expand the circumstances under which Bankers Life can issue chargebacks to its agents because it provides, "Commissions are charged back whenever premiums are refunded, or in situations where commissions are advanced, and the advanced commissions are considered unearned because the policy has been either cancelled, downgraded, or the policy has been removed from PPSP." R. 17-2 at 19. Bankers Life has not argued that this is a basis to dismiss Woerner's breach of contract claim based on impermissible chargebacks. But even if Bankers Life had made this argument, and even if the Court were to find that the Agent Manual is incorporated into the Agent Contract such that it is proper for the Court to consider the Manual on this motion to dismiss, the Court would not find that the Agent Manual requires Woerner's claim to be dismissed at this stage of the proceedings. Woerner has sufficiently alleged

7

B.      Fees

Woerner alleges that Bankers Life "has breached the Agent Contract by requiring [him and other agents] to pay hundreds of dollars in non-refundable fees unfront for licensing fees, list fees, and 'holdback accounts.'" R. 1-1 at 31 (¶ 75). But Woerner's allegations do not explain how these charges constitute breaches of the Agent Contract. Indeed, Section 10(b) of the Agent Contract requires agents to "pay for the renewal state agent license fees, and any occupational license fees required under local ordinances." R. 1-1 at 40 (¶ 10(b)). Additionally, Bankers Life attached to its motion an addendum to the Agent Contract that permits Bankers Life to withhold ten percent of an agent's commissions to establish a "holdback" account from which Bankers Life can deduct "chargebacks." *See* R. 17-2 at 14. The terms of the Agent Contract belie Woerner's allegations with respect to licensing fees and holdback accounts.

Bankers Life also attached an additional agreement purportedly signed by Woerner, pursuant to which he agreed to pay for "marketing programs and lead generation expenses," otherwise known as listing fees. R. 17-2 at 23. This contract is not referenced in Woerner's complaint, so the Court will not rely on it. Nevertheless, Woerner has not explained how the Agent Contract prohibits Bankers Life from

---

that Bankers Life has a practice of seeking impermissible chargebacks and that this practice was applied to his commissions. The Agent Manual might be a basis to demonstrate that some or all of the chargebacks are legitimate. But it is impossible to make that determination without knowing on which policies Bankers Life seeks each of the chargebacks at issue. As discussed, nobody knows the answer to that question except for Bankers Life, and Woerner's breach of contract claim cannot be addressed one way or another without that information.

8

charging agents listing fees. There may not be a provision in the Agent Contract that expressly permits listing fee charges, but there also does not appear to be a provision that prohibits it. Woerner's failure to plead why "listing fees" are in violation of the Agent Contract dooms his claim. Thus, Woerner's breach of contract claim is also dismissed to the extent he alleges that Bankers Life breached the Agent Contract by charging him listing fees.

## II. Breach of the Covenant of Good Faith and Fair Dealing

Woerner contends that Bankers Life has "the discretion to determine when . . . a refund will be made" that legitimately triggers a chargeback. *See* R. 29 at 14. Woerner argues that the covenant of good faith and fair dealing requires Bankers Life to exercise its discretion fairly, and its failure to do so is a basis for a cause of action for breach of that covenant.

Illinois courts are clear that the duty imposed by the covenant of good faith and fair dealing generally does not give rise to a cause of action in tort for breach of that duty. *See Voyles v. Sandia Mortg. Corp.*, 751 N.E.2d 1126, 1130-31 (Ill. 2001); *see also Cramer v. Ins. Exch. Agency*, 675 N.E.2d 897, 903 (Ill. 1996) ("This contractual covenant is not generally recognized as an independent source of duties giving rise to a cause of action in tort."). Rather, the covenant "is used only as a construction aid in determining the intent of contracting parties." *Cramer*, 675 N.E.2d at 906 (citing *Martindell v. Lake Shore Nat. Bank*, 154 N.E.2d 683, 690 (Ill. 1958) ("Every contract implies good faith and fair dealing between the parties to it, and where an instrument is susceptible of two conflicting constructions, one which

9

imputes bad faith to one of the parties and the other does not, the latter construction should be adopted.")). Illinois courts have primarily recognized an independent cause of action for breach of the covenant in the "narrow context" of an insurance company's duty to settle with a third party. *Voyles*, 751 N.E.2d at 1131. "The [Illinois Supreme Court] reasoned that in *that* setting the insured relies on the insurer for defense of the action, yet the insurer's interest in defeating the claim may conflict with the insured's interest in avoiding a judgment that exceeds the amount of the policy limits. The policy does not spell out the insurer's duty to settle, however, and therefore tort law remains an appropriate ground on which to evaluate the insurer's conduct." *Id.* (emphasis in original) (citing *Cramer*, 675 N.E.2d at 904).

Here by contrast, Woerner has not alleged a breach of the covenant of good faith and fair dealing that is distinct from his breach of contract claim. To the extent Bankers Life has discretion to determine whether circumstances exist that justify a chargeback, Bankers Life must exercise that discretion in good faith. *See Dayan v. McDonald's Corp.*, 466 N.E.2d 958, 972 (Ill. App. Ct. 1st Dist. 1984) (application of the covenant of good faith and fair dealing frequently arises when "the contractual obligation of one party was contingent upon a condition peculiarly within the power of that party."). If it becomes necessary for the Court to determine whether Bankers Life acted in good faith, the Court might have occasion to apply the covenant of good faith and fair dealing. But even if the covenant is relevant to such an analysis, the same evidence demonstrating bad faith will demonstrate that

10

the chargeback is not permitted under the contractual agreements between Woerner and Bankers Life. In other words, if Woerner is correct that Bankers Life acted unfairly in determining whether to seek a chargeback from him, that necessarily means that Bankers Life is seeking a chargeback in violation of the contractual agreements between the parties, in which case the proper remedy is for breach of contract. Woerner has not shown that a separate remedy in tort is necessary to provide relief to him or others in similar circumstances. Nor has he cited any case law supporting his argument. Rather, the cases he cites involve courts applying the covenant of good faith and fair dealing to breach of contract claims. *See* R. 29 at 11. Since Woerner's claims for breach of contract and breach of the covenant of good faith and fair dealing are coextensive, the latter is dismissed.

## III. Fraud

Woerner alleges that Bankers Life violates the ban on "pyramid schemes" contained in the Illinois Consumer Fraud and Deceptive Business Practices Fraud Act (the "Consumer Fraud Act"), 815 ILCS 505/2A(2). R. 1-1 at 33 (¶ 87). This claim fails substantively, and also because Woerner has not alleged the required connection to Illinois.

### A. Insufficient Connection to Illinois

The Illinois Supreme Court has held that a non-Illinois plaintiff, like Woerner, "may pursue a private cause of action under the Consumer Fraud Act if the circumstances that relate to the disputed transaction occur primarily and substantially in Illinois." *Avery v. State Farm Mut. Auto. Inc. Co.*, 835 N.E.2d 801,

11

853-54 (Ill. 2005). In *Avery*, the court rejected a claim by an out-of-state plaintiff under the following circumstances:

> Avery resides in Louisiana, not Illinois. His car was garaged in Louisiana and his accident occurred there as well. Avery's estimate was written in Louisiana and he received his "Quality Replacement Parts" brochure in Louisiana. The alleged deception in this case—the failure to disclose the inferiority of non-OEM parts [which State Farm uses to repair its customers' cars following accidents]—also occurred in Louisiana. The repair of Avery's car took place in Louisiana. Damage to Avery, if any occurred in Louisiana. Moreover, there is no evidence that Avery ever met or talked to a State Farm employee who works in Illinois. Avery's contact with State Farm was through a Louisiana agent, a Louisiana claims representative, and Louisiana adjustor. In sum, the overwhelming majority of the circumstance which relate to Avery's . . . claims proceedings—the disputed transaction in this case—occurred outside Illinois.

*Id.* at 854. In another case, the Illinois Supreme Court came out in favor of applying the Consumer Fraud Act under the following circumstances:

> (1) the contracts containing the deceptive statements were all executed in Illinois; (2) the defendant's principal place of business was in Illinois; (3) the contract contained express choice-of-law and forum-selection clauses specifying that any litigation would be conducted in Illinois under Illinois law; (4) complaints regarding the defendant's performance were to be directed to its Chicago office; and (5) payment for the defendant's services were to be sent to its Chicago office.

*Id.* at 855 (citing *Martin v. Heinold Commodities, Inc.*, 510 N.E.2d 840 (Ill. 1987)).

Woerner argues that his allegations are like the facts in *Martin* because he alleges that Bankers Life "ran a pyramid scheme in violation of the [Consumer Fraud Act] (1) which was headquartered in Illinois; (2) where plaintiffs and every

12

class member were required to sign a contract with [Bankers Life] that 'provides for litigation in Illinois under Illinois law' and (3) where several wrongful acts in furtherance of the pyramid scheme emanated from Illinois." R. 29 at 16. These allegations are insufficient. The choice of law clause might be evidence that the parties anticipated that certain conduct would take place in Illinois, but it is not evidence that any conduct relevant to the fraud Woerner alleges actually did take place in Illinois. Woener's remaining allegation—that the "pyramid scheme was designed, initiated, and perpetrated out of Illinois where Bankers Life maintains its corporate headquarters," R. 1-1 at 34 (¶ 90)—is an insufficient basis on which to apply the Illinois Consumer Fraud Act. A number of courts have found that the allegation that a fraudulent scheme emanated from Illinois is insufficient to apply the Consumer Fraud Act to an out-of-state resident. *See Avery*, 835 N.E.2d at 855 ("scheme to defraud was 'disseminated' from [defendant's] headquarters [in Illinois was] insufficient" to state a claim under the Consumer Fraud Act); *Int'l Profit Assocs., Inc. v. Linus Alarm Corp.*, 971 N.E.2d 1183, 1194 (Ill. App. Ct. 2d Dist. 2012) (allegations regarding "activities that occur routinely in corporate headquarters" are insufficient); *Phillips v. Bally Total Fitness Holding Corp.*, 865 N.E.2d 310, 316 (Ill. App. Ct. 2d Dist. 2007) ("Under *Avery,* plaintiffs' claim that the deceptive policies were devised in and promulgated from Illinois is not sufficient to establish a nexus with Illinois."); *Sgouros v. Transunion Corp.*, 2016 WL 4398032, at *5 (N.D. Ill. Aug. 18, 2016) (headquarters in Illinois is insufficient); *Greene v. Sears Protection Co.*, 2016 WL 397375, at *3 (N.D. Ill. Feb. 2, 2016) (same); *Haught*

13

*v. Motorola Mobility, Inc.*, 2012 WL 3643831, at *4 (N.D. Ill. Aug. 23, 2012) (holding that Consumer Fraud Act protection should not be extended to the plaintiff's transaction with the defendant even though "the alleged misrepresentations were designed in Illinois and disseminated on a website registered and hosted in Illinois" and "the terms of an agreement relating to his use of [the defendant's services] provide[d] for the resolution of disputes under Illinois law"); *Van Tassell v. United Mktg. Grp., LLC*, 795 F. Supp. 2d 770, 781 (N.D. Ill. 2011) ("While the defendant insurer had its headquarters in Illinois and the deceptive practices were devised and disseminated from those headquarters, the Illinois Supreme Court held those allegations were insufficient as a matter of law to support an [Consumer Fraud Act] claim."). Moreover, none of Woerner's other allegations point to Illinois: he is a Virginia resident; he signed his Agent Contract in Virginia; he solicited customers and sold policies in Virginia; he does not allege that he ever traveled to Illinois on business for Bankers Life; he does not allege that he ever interacted with anyone from Bankers Life in Illinois or made any payments to Bankers Life in Illinois; the return address and area code on the letter he received from Bankers Life regarding chargebacks are from Indiana. In sum, Woerner has failed to allege that the fraud scheme occurred in Illinois at all, let alone "primarily and substantially." For this reason, his Consumer Fraud Act claim is dismissed.[2]

---

[2] Bankers Life argues that Woerner's Consumer Fraud Act claim should be dismissed because he is not a "consumer." R. 17 at 11. But the purpose of the Consumer Fraud Act is "to protect [not only] consumers, [but] borrowers, and business persons [as well]." *Robinson v. Toyota Motor Credit Corp.*, 775 N.E.2d 951, 960 (Ill. 2002). "Courts have held that two types of persons can state claims under

## B. Failure to Allege a Pyramid Scheme

Even if Woerner had sufficiently alleged a connection to Illinois (which he has not), his allegations also fail to state a claim for a pyramid scheme. Under the Consumer Fraud Act, a "pyramid sales scheme" is defined as:

> any plan or operation whereby a person in exchange for money or other thing of value acquires the opportunity to receive a benefit or thing of value, which is primarily based upon the inducement of additional persons, by himself or others, regardless of number, to participate in the same plan or operation and is not primarily contingent on the volume or quantity of goods, services, or other property sold or distributed to be sold or distributed to persons for purposes of resale to consumers.

815 ILCS 505/1(g). Woerner contends that his allegations fit the statute because his complaint "clearly alleges that (1) [he] and new agents pay fees in order to acquire the opportunity to generate commissions for marketing Bankers Life policies; and (2) the commissions they generate are created mainly by re-writing the policies previously written by prior new agents. And this scheme repeats itself, over and over, as new agents are hired and slightly older agents are terminated." R. 29 at 13.

Although Woerner alleges that "approximately 60% of Bankers Life's business is based on this scheme," R. 1-1 at 34 (¶ 89), the Court cannot see how it could be lucrative for Bankers Life. Although Woerner *argues* that commissions are

---

the Act: "'consumers' and persons who, although non-consumers, have suffered damages resulting from conduct that is either directed toward the market or otherwise implicates consumer protection concerns." *Wilo USA, LLC v. Desert Boilers & Controls, Inc.*, 2014 WL 4214839, at *2 (N.D. Ill. Aug. 22, 2014). It may be that Woerner is not the type of person or entity that can bring a claim under the Consumer Fraud Act. But the parties failed to address the relevant authority, so the Court will not apply it here.

"generated" by "re-writing" policies, that is not what he *alleges*, and it would not be plausible if he did. Nowhere does Woerner allege that the "re-writes" cause policyholders to be required to pay an additional premium, which is of course the source of a commission. It would be surprising if Bankers Life's customers tolerated a practice of having to pay additional premiums because Bankers Life decided to "re-write" their policies for "non-material reasons," as Woerner alleges. R. 1-1 at 10 (¶ 22). But this is not what Woerner actually alleges. Instead, he alleges that "re-writing" the policies serves the purpose of taking commissions (and the right to receive future commissions from policy renewals) from former agents and giving them to current agents. *Id.* at 10-11 (¶¶ 22-23). Woerner has alleged how "re-writing" policies might be lucrative for new Bankers Life agents, but Woerner's allegations do not explain how this practice would be lucrative for Bankers Life itself, because he has not alleged that it generates any additional revenue. Thus, Woerner has failed to allege a plausible pyramid scheme.

Similarly, to the extent Woerner alleges that Bankers Life's business model is based on hiring many more agents than it requires in order to profit from the fees assessed to new agents, these allegations also fail to allege a pyramid scheme. Although agents might be said to pay the fees in order to acquire the "opportunity" to sell Bankers Life policies, or have the "opportunity" to benefit from "re-writing" the policies of former agents, neither of these benefits is "primarily based upon the inducement of additional persons . . . to participate in the same plan or operation and is not primarily contingent on the volume or quantity of goods, services, or

other property sold." 815 ILCS 505/1(g). For Woerner's allegations to state a claim, he would have to allege that it is in the agents' interests to recruit more agents "to participate in the same plan." *Id.* But under Woerner's allegations it is distinctly not in the agents' interests to recruit new agents. In fact, according to Woerner, the new agents cannibalize the former agents' commissions. And as discussed, no matter how many policies are "re-written," the commissions are only ever generated from "the volume or quantity of goods, services, or other property sold" in the form of sales of policies. Although Bankers Life might plausibly generate revenue from the fees it charges new agents, thereby giving Bankers Life an incentive to cycle through as many new agents as possible, the agents do not join in this incentive. By contrast, the Consumer Fraud Act requires the recruiter of "additional persons," and the "additional persons" themselves, to be part of the "same plan." 815 ILCS 505/1(g). Woerner's allegations demonstrate a fundamental disconnect between the incentives of Bankers Life and its agents such that they cannot plausibly be said to be part of the same pyramid scheme plan. Therefore, Count III is dismissed.

**Conclusion**

For the foregoing reasons, Bankers Life's motion, R. 16, is denied with respect to Count I's allegations regarding chargebacks; and granted with respect to Count I's allegations regarding fees, Count II, and Count III, which are dismissed without prejudice. Should Woerner believe he can cure the deficiencies the Court has described in this opinion and order, he may file a motion for leave to file an amended complaint by December 2, 2016. The motion should attached a proposed

17

amended complaint and be supported by a brief of no more than five pages describing how the proposed amended complaint cures the deficiencies in the current complaint. Should Woerner choose to file such a motion, Bankers Life should not respond unless ordered to do so by the Court. At the status hearing set for November 8, 2016, Woerner should be prepared to inform the Court and Bankers Life whether he intends to file a motion for leave to amend.

ENTERED:

_____
Honorable Thomas M. Durkin
United States District Judge

Dated: October 27, 2016